[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a medical malpractice case wherein the plaintiff, a then 66 year old male, was treated by the defendant, a chiropractic doctor, for a plantar fascitis condition in his right heel. Prior to being seen by the defendant he had been to two podiatrists between April and August, 1996 who treated him with strapping of his foot, "off-the-shelf" orthotics and injections, but without much relief. His condition caused him some discomfort and limitation of activity as there was heel pain upon walking for any significant distance, or when walking barefoot.
Dr. Batherson elected to soften the heel through the use of a hydroculator pack (hereinafter "hot-pads") prior to manipulating or stretching the plaintiffs plantar tissue. The hot pack consists of a canvas container filled with silicone to retain heat. The pack is placed into hot water, then removed and allowed to drip dry. It is then placed into a terrycloth sleeve. Additional toweling is placed on the patient and the hot pack applied over the toweling and held in place with a velcro strap.
In this case the plaintiff was made to lie on his stomach and the hot pack, as described above, was fastened to his heel. The defendant then left the treatment room, closing the door behind him. He returned twelve to fifteen minutes later.
The plaintiff experienced the heat on his heel getting increasingly hotter. At about the ten minute mark he tried to kick the pack off with his free foot but could not do so. When Dr. Batherson came back after twelve to fifteen minutes, the plaintiff said "you're burning the hell out of my foot" and told him he should have a bell in the room to summon for assistance. After the stretching procedure was done the plaintiff drove himself home but at about 8 p.m. that night he called Dr. Batherson at his home because his heel had blistered and he was in substantial pain. The plaintiff was told to come to the office in the morning and was there seen by the defendant and his wife who is a registered nurse. They applied a burn cream and immediately made an appointment for the plaintiff with his family physician. (The initial treatment was on or about October 1, 1996).
Dr. Laguardia (the family physician) continued treating the would [wound] with burn cream, but by October 28th, determined the heel was quite tender, and a skin graft was probably needed. The procedure was CT Page 7949 done on October 30th at Hartford Hospital by Dr. Jonathan Schreiber with skin taken from the left thigh. He was discharged from the hospital on November 1st but had to use crutches for approximately two months and then a cane for approximately one month longer.
The issues in this case are negligence, proximate cause and damages.
In a medical malpractice case the question of negligence is whether or not the defendant departed from the standard of care, that is, did the defendant exercise that degree of care, skill and diligence which chiropractors in the same general line of practice ordinarily have and exercise in like situations. The plaintiff has the burden of proof, and in this case has met that burden.
The Court finds the testimony of the plaintiffs expert, Dr. Robert Stern, to be more compelling and persuasive. Dr. Stern is a graduate of the National College of Chiropractic Medicine and licensed in Connecticut and Florida. His credentials include serving as the Commissioner of the State of Connecticut Board of Chiropractic Examiners for some ten years. He has experience in peer review matters and is presently the medical director of alternative medicine for Anthem Blue Cross and Blue Shield (among his other credentials and experiences).
His testimony, given with reasonable medical certainty, was that the plaintiffs injuries arose from the hot-pack treatment (which is not seriously disputed). He testified, quite credibly, that the defendant breached the standard of care by not checking his patient within two to four minutes and that the checks should include asking the patient if he is ok as well as visually looking at the area being treated. This is especially important when the patient has plantar fascitis which is essentially an inflammation of tissue — an indication the patient should be checked early for sensitivity to heat or other distress. Dr. Stern's opinion is both reasonable and logical.
While the defendant's expert, Dr. Michael Yoel, who is also a graduate of the National College of Chiropracty and with twenty years of experience in the field testified that leaving a patient with a hot pack for twelve to fifteen minutes is common practice as an "unattended modality," that testimony is weakened by his deposition testimony that there should always be some supervision and his trial testimony that he does not use hot packs on extremities.
It is also noted that the defendant did not instruct the plaintiff to call out if he was in distress, but simply closed the door and left the room. In that situation it surely is reasonable and logical that a reasonably prudent chiropractor would not wait twelve to fifteen minutes CT Page 7950 to check his patient while a hot pack is being applied.
The plaintiff has established that the negligence of the defendant proximately caused the injury. Again, Dr. Stern testified that if the defendant had checked his patient within the initial two to four minutes, he would have been aware the patient was in distress and the severe injury avoided. In his words, after twelve to fifteen minutes it is too late — the damage is done.
We now turn to a consideration of damages. The plaintiff sustained a deep second or third degree burn to his heel. For the one month period between the incident and the surgery, he was in considerable pain and had very limited mobility. His bandages had to be changed several times each day and he had very little sleep. He then underwent the skin graft operation and was hospitalized for two days. He had to use crutches post-surgically for a couple of months and could not put weight on that foot. He was required to use a hair dryer on his thigh (the graft donor site) for ten to twenty minutes at least four times a day, and used a cane for about a month following the crutches. There remains a discrepancy in the level of his heel at the graft site due to difference in skin thickness of the thigh skin and the natural heel.
His ability to do certain prior customary activities has been diminished. He and his wife enjoyed dancing regularly before and now it's sporadic and perhaps for thirty minutes as opposed to several hours previously.
He and his wife enjoyed taking their grandchildren to fairs, including the Big E in Springfield. Now they go in two cars because he cannot tolerate the walking and leaves early. Also, he can no longer walk through shopping malls as he did previously and now sits on a bench while his wife shops. In short his usual and customary daily activities have been curtailed and, since it has been almost four years since the surgery any improvement is unlikely. (The parties have stipulated that his actuarial life expectancy is 12.5 years).
However not all his limitations can be attributed to this injury. He had been suffering from heel pain for some six months before being treated by the defendant for his plantar facitis. According to the podiatrist who did an IME for the defendant, he noted the interface between the thick heel skin and the thinner grafted skin was quite tender, and he attributed 20% of the plaintiff's problem to his pre-existing condition.
Taking the foregoing into account the Court determines fair, just and reasonable compensation to be as follows: CT Page 7951
Economic Damages $ 6404.38
Non-Economic Damages 90000.00
Total: $ 96404.38
(Non-economic damages determined to be $40,000 for pre and post-surgical pain and suffering and $4000 per year for permanent pain and suffering, ($4000 x 12.5 $50000).
The Court has given consideration to the plaintiffs pre-existing condition of approximately 20% of his present incapacity in this determination.
A motion for collateral source reduction should be filed in accordance with Practice Book § 16-35, if the defendant wishes to do so. (In the alternative the parties may stipulate to such a reduction within the time period set forth in the Practice Book). Otherwise, judgment will enter in the amount of $96404.38 plus costs.
 ___________________, J. Klaczak